1
2
3
4
5
6

UNITED STATES DISTRICT COURT

7

FOR THE EASTERN DISTRICT OF CALIFORNIA

8

JOSE GUADALUPE CALDERON,

9

Petitioner,

10

v.

NO. CIV S-07-0716 JCC

ORDER

11

LARRY SCRIBNER, Warden, et al.,

12

Respondent.

13

14       This matter comes before the Court on Petitioner Jose Calderon's petition for a writ of

15 habeas corpus under 28 U.S.C. § 2254 (Dkt. No. 1); Respondent Larry Scriber's Answer (Dkt. No.

16 11); and Petitioner's Traverse (Dkt. No. 15). Having reviewed the relevant documents, the

17 governing law, and the balance of the record, the Court DENIES the Petition for the reasons that

18 follow.

19 **I.       PROCEDURAL BACKGROUND**

20       Petitioner is a state prisoner at Calipatria State Prison in California, serving a sentence of

21 life without possibility of parole, plus one year. (Pet. 2 (Dkt. No. 1 at 1).) Petitioner was convicted

22 by a jury on December 16, 2003, on four counts: (1) kidnapping for ransom, (2) robbery, (3) false

23 imprisonment, and (4) assault with a firearm. (*Id.*) The jury found that Petitioner was armed with a

ORDER - 1

1   handgun during the commission of all counts, and also found that the victim of the kidnapping

2   suffered bodily harm and was "intentionally confined in a manner which exposes [him] to a

3   substantial likelihood of death." (Answer 9 (Dkt. No. 11)); *see* CAL. PENAL CODE § 209(a).

4   Petitioner timely appealed to the California Court of Appeal on January 20, 2004. (Pet. 3 (Dkt. No.

5   1 at 2).) The appellate court issued an unpublished opinion on October 27, 2005, reversing the

6   third count of false imprisonment but affirming the convictions for the remaining three counts and

7   leaving his sentence unchanged. (Answer 9 (Dkt. No. 11).) Petitioner then sought further review

8   with the California Supreme Court, which denied his Petition for Review on January 18, 2006.

9   (*Id.*) On April 16, 2007, Petitioner filed this habeas petition with the United States District Court

10  for the Eastern District of California. (Pet. (Dkt. No. 1).)

11  **II.      APPLICABLE STANDARD**

12        Federal law requires that a state prisoner provide the state court with the opportunity to rule

13  on federal habeas claims before presenting those claims to the federal court. *See Picard v.Connor*,

14  404 U.S. 270, 275 (1971); 28 U.S.C. § 2254(b)(1). Because Petitioner raises the same four issues

15  in his habeas petition that he raised at the California Court of Appeal and in the California

16  Supreme Court, Respondent agrees that Petitioner has properly exhausted his available state

17  remedies. (Answer 9 (Dkt. No. 11).)

18        A state prisoner may collaterally attack his detention in federal district court under 28

19  U.S.C. § 2254 if he is being held in violation of the Constitution or laws and treaties of the United

20  States. 28 U.S.C. § 2254(a). Review of state court decisions, however, is sharply limited. A federal

21  court may not grant a state prisoner's habeas petition unless the state court's adjudication (1) "was

22  contrary to, or involved an unreasonable application of, clearly established federal law, as

23  determined by the Supreme Court"; or (2) "was based on an unreasonable determination of the

1  facts in light of the evidence presented in the state court proceedings." 28 U.S.C. § 2254(d).

2          Under the first prong of § 2254(d), a state court decision is "contrary to" federal law if the

3  state court applies a rule that contradicts the governing law from Supreme Court precedent or

4  decides the case differently from a Supreme Court case with materially indistinguishable facts. *See*

5  *Williams v. Taylor,* 529 U.S. 362, 405–06 (2000). A state court decision is an "unreasonable

6  application" of federal law if the state court correctly identifies the governing law but

7  unreasonably applies the rule to the facts of the petitioner's case. *See id.* at 413. An unreasonable

8  application means more than that the district court, in its independent judgment, believes that the

9  relevant state court decision applied the law incorrectly or clearly erroneously; rather, the

10  application must be "objectively unreasonable." *Lockyer v. Andrade,* 538 U.S. 63, 75–76 (2003)

11  (citations omitted).

12          Under the second prong of § 2254(d), to show that the state court unreasonably determined

13  the facts, the petitioner must overcome a presumption that the state court correctly determined

14  factual issues. 28 U.S.C. § 2254(d), (e)(1). The petitioner carries the burden of rebutting the

15  presumption of correctness by clear and convincing evidence. *Id.*

16  **III.    FACTUAL BACKGROUND**

17          The Court begins with a general overview of the facts here, reserving discussion of certain

18  particular facts for more complete treatment in later discussion of the related claims.

19          Humberto Arreola owned a landscaping company that employed around sixty-five people,

20  including Petitioner Jose Calderon and his brother, Enedino Calderon. (Ct. App. Op. 2 (Dkt. No.

21  12).)[1] Petitioner had worked for Arreola for about a year and Enedino had worked there for about

22  six months. (*Id.*) Arreola interacted with both men on numerous occasions during the course of

---

[1] The majority of the facts are drawn from the opinion of the California Court of Appeal (Dkt. No. 12). Neither party has indicated an objection to these facts.

their employment, even loaning them money on several instances to help them bring relatives over from Mexico and to help them in purchasing a car. (*Id.*)

In December 2002, Enedino got into a heated argument with Arreola's brother, and as a result, Enedino was fired from the landscaping company. (*Id.* at 3.) Petitioner was also fired later that same month for drinking alcohol and as a result of the shortage of work. (*Id.*) Following his termination, Petitioner aggressively demanded repayment of the deposit he had paid for his company uniforms. (*Id.*)

The kidnapping took place several weeks later on the morning of January 9, 2003. (*Id.*) Arreola arrived to work at 6:00 a.m., parked his truck, and began walking towards the entrance to the business. (*Id.*) Suddenly, three men clad in dark clothing ran at him and started beating him. Two of the men wore masks, one of which was wielding a gun. (*Id.*) At one point in the struggle, the man with the gun pointed it at Arreola and Arreola heard what he thought to be a gunshot. (*Id.*) Arreola tried to run, but his assailants caught him and continued beating him, striking him in the head and face with their fists and with the gun. (*Id.*) During the struggle, Arreola was able to unmask the two men, and he immediately recognized them as Enedino and Jose Calderon, his former employees. (*Id.*)

Enedino told Arreola that nothing would happen to him if he behaved, and then the three assailants set about tying Arreola up with red tape. (*Id.*) At that point, Arreola had several minutes to observe Enedino and Jose before a small blue car pulled up. The assailants then taped over Arreola's eyes, placed him into the trunk of the car, and drove away from the parking lot. (*Id.*) Jason Dill, an employee of a neighboring company, observed the attack. (*Id.*) He testified that on three prior occasions, he had seen three or four Mexican males in the same four-door Honda Civic drive up, park near Arreola's business, look around, and then drive off. (*Id.* at 3–4.) After the

attack, Dill observed a puddle of blood on the ground where Arreola had been beaten, and then called 9-1-1. (*Id.* at 4). The responding police officer also observed the blood and some unspent .22-caliber and .38-caliber ammunition on the ground. (*Id.*)

Arreola was bound in the trunk of the car for what he estimated to be twenty minutes before his assailants took him out of the trunk and led him to a room. (*Id.*) He could not see anything and feared for his life. (*Id.*) Enedino informed Arreola that he was being kidnapped for a ransom of $500,000, though Arreola responded that he could not come up with that amount of money. (*Id.*) Arreola heard Petitioner tell Enedino to remove Arreola's cell phone and pager, and someone took his pager and wallet, including $700 in cash. (*Id.*)

Finally, Arreola's assailants left the room and he was alone. (*Id.*) Arreola did not immediately try to free himself, assuming someone would be there with him, but after an hour had passed, he began trying to untie his bonds and succeeded about twenty-five minutes later. (*Id.*) He discovered he was in a rundown old farmhouse. Arreola then left through an open window, started walking up the road, and around 7:40 a.m., a woman driving by stopped and called 9-1-1 on his behalf. (*Id.* at 4–5.) An investigating police officer found red packing tape in the farmhouse and blood on the walls and air-conditioning duct near the window. (*Id.* at 5.)

Arreola was taken to the hospital, where he was treated for several lacerations on his head, one of which required eight staples to close and another that required six stitches. (*Id.*) He also had a broken nose and substantial contusions and abrasions elsewhere on his body. (*Id.*) Arreola's doctor characterized his injuries as substantial and significant, and consistent with being "pistol whipped." (*Id.*)

A police officer went to Arreola's business and learned from another employee that two brothers, Enedino and Jose, had been recently fired. (*Id.*) The officer also learned their address,

ORDER - 5

1   and that one of the brothers drove an older, blue, four-door Honda. (*Id.*) The police arrived at

2   Petitioner's house around 9:30 a.m. and arrested him. (*Id.*) Enedino and another man, Julio

3   Zamora, were arrested shortly thereafter when they drove by in a red Mustang. (*Id.*) Enedino was

4   carrying $343 in cash, and Petitioner had $634 on him. (*Id.* at 6.) According to Enedino's

5   girlfriend, Amanda Denton, Enedino drove a red Ford Mustang and Petitioner drove a blue four-

6   door Honda. (*Id.*) A subsequent search of the Honda revealed blood in the trunk and passenger

7   compartment, and officers searching Jose and Enedino's house discovered shoes with fresh mud

8   on them and documents linking the men to the Honda. (*Id.*) Police also found bullets and shell

9   casings at the residence, which were similar to those found at the crime scene, and there was blood

10  on Amanda Denton's jacket, which Enedino sometimes wore. (*Id.* at 7.) The blood found on the

11  jacket, in the car, and at the crime scene was determined to be human. (*Id.*)

12        On March 3, 2003, police received a report that a truck driver had discovered a garbage bag

13  alongside a marshy waterway which contained a ransom note. The bag also contained Arreola's

14  driver's license and wallet, a latex glove, a black cloth glove, a black ski mask, two orange ski

15  masks, a Spanish newspaper, shoes, and items of clothing. (*Id.* at 8.) The ransom note read as

16  follows: "Brothers Arreola, you have until tomorrow get . . . get together five hundred thousand

17  dollars. If you resist, he dies. I don't want police because there is no deal, and wait for instruction."

18  (*Id.*) A forensic document expert concluded that there were "indications" that Enedino was the one

19  who had written the note. (*Id.*)

20  **IV.    DISCUSSION**

21        In his habeas petition, Petitioner reiterates the same four grounds for relief raised before the

22  California Court of Appeal and the California Supreme Court: (1) his federal constitutional rights

23  were violated by both the use of a shared interpreter and by a lack of an interpreter during one

ORDER - 6

stretch of trial; (2) his federal constitutional rights were violated when the trial court excluded proposed expert testimony on eyewitness identification; (3) the trial court abused its discretion in refusing to strike the bodily harm enhancement; and (4) his sentence of life without possibility of parole constitutes cruel and unusual punishment. (Pet. 3 (Dkt. No. 1).) The Court will address each of Petitioner's grounds for relief in turn.

### A.  Claim One: The Provision of an Interpreter at Trial

Petitioner first claims that there was constitutional error when, without personal waiver, he was forced to share an interpreter with his codefendant, and on one occasion, was deprived of an interpreter's assistance altogether. (Pet. 6 (Dkt. No. 1 at 5).)

#### 1.  Background

Petitioner, like his co-defendants, Julio Zamora and Enedino, does not speak English and required Spanish translation at the preliminary hearings and at trial. Zamora pled no contest before voir dire and was not involved later at trial. The court generally employed a team approach to translation, whereby one interpreter would translate the proceedings to Spanish, and a second interpreter was available on reserve to facilitate any communications between the co-defendants and their attorneys. (Ct. App. Op. 11 (Dkt. No. 12).) This team approach was employed for Petitioner and his brother throughout proceedings, and their attorneys agreed to the procedure. (*Id.*) If the defendants wished to speak to their attorneys at any time, they were advised to raise their hands and proceedings would be paused—an option that the defendants availed themselves of on a few occasions. (*Id.*)

There were, however, several instances when the defendants shared one interpreter without another on reserve, including at the time the verdict was read, at sentencing, and on a few occasions during pretrial proceedings. (*Id.*) On one occasion, when the second interpreter was

1  delayed for approximately sixty minutes by a traffic accident, Petitioner's counsel agreed to

2  proceed with only one interpreter during a portion of Enedino's testimony. (*Id.* at 12.) During this

3  time, the interpreter would translate the attorneys' questions into Spanish for both Enedino and for

4  Petitioner, and then Enedino would provide his responses in Spanish loudly enough for Petitioner

5  to hear clearly. The interpreter then would translate those answers back into English for the court.

6  (*Id.*) Similarly, the next day, there was another short period of time during Enedino's testimony

7  when Petitioner did not have a dedicated interpreter by his side. While there was a second

8  interpreter present in the courtroom, that interpreter was devoted to assisting a prosecution witness,

9  Ismael Castro, who also did not speak English. (*Id.*)

10          **2.  Discussion**

11          Respondent asserts that Petitioner's first claim—that his constitutional rights were violated

12  by the interpreter arrangement—should be barred by the nonretroactivity principle in *Teague v.*

13  *Lane,* 489 U.S. 288, because Petitioner seeks the announcement of a new procedural rule. (Answer

14  16 (Dkt. No. 11 at 23).) Indeed, Petitioner concedes that the Supreme Court has never explicitly

15  recognized a constitutional right to a court-appointed interpreter. (Traverse 6 (Dkt. No. 15).) To

16  the extent that Petitioner simply asserts such a right for defendants to have their own court-

17  appointed interpreter, his claim would *not* be eligible for habeas relief under 28 U.S.C. § 2254

18  because he would not have met his burden to state a federal claim or show some clearly

19  established federal law which the trial court violated or unreasonably applied. *See* 28 U.S.C. §

20  2254(d). However, by and large, Petitioner focuses this first claim not on his right to a personal

21  interpreter, but on the alleged violation of his rights under the Fifth, Sixth and Fourteenth

22  Amendments, including the denial of his right to communicate with counsel. (Pet. 6 (Dkt. No. 1 at

23  5).) Accordingly, Petitioner's claim does not necessarily seek the announcement of a new

1    procedural rule, as Respondent suggests, but simply implicates a violation of his already

2    established federal constitutional rights.  *Teague* is not implicated and need not be addressed.

3          The first component of Petitioner's claim is that his trial was unconstitutional because he

4    was forced to share an interpreter with his codefendant. In support of this proposition, Petitioner

5    contends that his legal defense strategy conflicted with that of his brother. (*Id.*) Yet there is little

6    factual support for this contention. As mentioned above, both Petitioner's and Enedino's attorneys

7    agreed to the use of the shared interpreter approach and at no time did either attorney suggest that

8    the arrangement would pose problems for their clients or that their defenses would conflict. (Ct.

9    App. Op. 15 (Dkt. No. 12).) The attorneys even worked in tandem at times. For example, during

10   voir dire Enedino's attorney deferred to the decisions and juror selections of Petitioner's attorney.

11   (*Id.*) The California Court of Appeal found unequivocally that the codefendants did not have

12   conflicting defenses, pointing out that "both defendants argued that they did not kidnap Arreola

13   and that his identification of them was infirm. Neither defendant attempted to implicate his

14   codefendant, and they did not have conflicting alibis. . . . Enedino's testimony was helpful to Jose

15   rather than damaging." (*Id.* at 15–16.)

16         The second component of Petitioner's claim is a byproduct of Petitioner's first objection to

17   the team interpreter approach. Petitioner contends that, when there was but one interpreter present

18   for himself and his brother, he was essentially deprived of an interpreter altogether. Again, absent

19   a clearly defined federal law from the Supreme Court creating any right to an interpreter,

20   Petitioner's federal claim focuses on the fact that he had no means of communicating with his

21   attorney during these brief periods when there was only one interpreter present.

22         When a criminal defendant lacks the ability to speak or understand English, an interpreter

23   may be vital to ensure the defendant's right to a fair trial. *United States v. Si*, 333 F.3d 1041, 1042

ORDER - 9

(9th Cir. 2003). Nevertheless, the Court finds that this right was not meaningfully abridged or violated in this case. Petitioner was provided with clear word-for-word translation from English to Spanish through the entire proceedings. (Ct. App. Op. 16 (Dkt. No. 12).) For most of the trial, he had a second interpreter close at hand. (*Id.* at 11, 13.) There was no indication anywhere in the record that Petitioner had a need or desire to speak with his counsel during those brief periods when there was only one translator. (*Id.* at 16.) And finally, as the California Court of Appeal found, Petitioner had, since preliminary hearing proceedings, been fully aware of his ability to stop the trial if and when he should need to communicate with his attorney. (*Id.*)

The Seventh Circuit Court of Appeals addressed a similar claim in *United States v. Johnson,* 248 F.3d 655, 663 (7th Cir. 2001). In that case, the defendants also argued that such a shared interpreter arrangement violated their Fifth and Sixth Amendment rights by failing to provide an additional court-appointed interpreter to be by their side at the defense table. The court rejected that claim:

> While we do read the Constitution as ensuring a defendant's right to communicate with his or her counsel, we do not read the Constitution as mandating the appointment of an additional interpreter to sit at the defense table. The solution adopted by the district court to allow the defendants to use the court-appointed interpreter to communicate with their counsel during breaks fulfilled the defendants' right to communicate with counsel.

*Id.* at 664. The Court finds the same reasoning persuasive in Petitioner's case. The trial court's approach to translation was not "contrary to" or an unreasonable application of Petitioner's federal constitutional rights, 28 U.S.C. § 2254(d), and Petitioner's claim is denied.

**B.  Claim Two: Expert Testimony on Eyewitness Identification**

During trial, the victim, Arreola, gave eyewitness testimony about his kidnapping and expressly identified Petitioner as one of three persons responsible. Petitioner sought to introduce expert testimony contesting and undermining the accuracy of eyewitness identification, but the

ORDER - 10

1    Prosecution moved *in limine* to exclude that expert testimony. (Answer 29 (Dkt. No. 11).) The trial

2    court granted the motion to exclude, concluding that expert testimony on eyewitness identification

3    was unnecessary, since Arreola's prior familiarity with Petitioner made his identification

4    sufficiently reliable, and since there was additional evidence to independently corroborate

5    Arreola's identification of Petitioner as one of his assailants. (Pet. 8 (Dkt. No. 1 at 7).) Petitioner

6    argues that the trial court erred by depriving him "of his right to present expert testimony on

7    eyewitness identification." *(Id.)*

8          To prevail on this argument for habeas relief, Petitioner must show that the state court's

9    decision was either (1) "contrary to, or involved an unreasonable application of, clearly established

10   federal law . . ." or (2) "was based on an unreasonable determination of the facts in light of the

11   evidence presented in the state court proceedings." 28 U.S.C. § 2254(d). The first prong of the

12   analysis does not help Petitioner's case for habeas relief. There is no clearly established federal

13   law or authority requiring that such expert testimony be allowed into evidence, *see Jordan v.*

14   *Ducharme*, 983 F.2d 933, 938–39 (9th Cir. 1993), and the Ninth Circuit has "repeatedly upheld the

15   exclusion of such testimony," *see United States v. Langford*, 802 F.2d 1176, 1179 (9th Cir. 1986).

16   Because federal habeas corpus is only available under 28 U.S.C. § 2254(d) when there has been a

17   transgression of federal law that is binding on the state courts, *Middletown v. Cupp*, 768 F.2d

18   1083, 1085 (9th Cir. 1985), and because there is no applicable binding federal law, Petitioner's

19   second claim fails to state a cognizable federal basis under which he is eligible for relief.

20         Petitioner seeks to implicate a federal claim in his traverse by characterizing the trial

21   court's denial of expert testimony as an error that violates his constitutional rights "to

22   confrontation, due process of law, compulsory process, and to present a defense under the Fifth,

23   Sixth, and Fourteenth Amendments." (Traverse 14 (Dkt. No. 15).) These broad assertions,

ORDER - 11

1    however, are unsupported. Moreover, habeas petitioners may not simply transform state-law issues

2    into federal ones by, for instance, asserting a violation of due process. *Langford v. Day*, 110 F.3d

3    1380, 1389 (9th Cir. 1996).

4           Even if Petitioner had stated a basis for federal habeas relief, his second claim fails on the

5    merits. The trial court's evidentiary decisions are the province of state law and the "decision to

6    admit such evidence is left to the broad discretion of the trial judge." *Jordan v. Ducharme*, 983

7    F.2d at 938. Petitioner has not shown that the trial court abused its discretion. As for the second

8    prong of 28 U.S.C. § 2254(d), to be eligible for habeas relief, Petitioner must demonstrate that the

9    state court made an "unreasonable determination of the facts". However, the petitioner must

10   overcome the strong presumption that the state court correctly determined factual issues. 28 U.S.C.

11   § 2254(d), (e)(1). The petitioner carries the burden of rebutting the presumption of correctness by

12   clear and convincing evidence, and this presumption is even harder to rebut where the trial court is

13   already afforded broad discretion, as is the case with the decision to admit or deny expert

14   testimony. *Id.*

15          Petitioner has not shown that the state court unreasonably determined the facts or abused its

16   discretion regarding expert testimony. As Respondent points out, most of the potential problems

17   and difficulties in ordinary eyewitness identification are not present in this case. (Answer 30 (Dkt.

18   No. 11).) Petitioner and the victim, Arreola, were already acquainted with one another from prior

19   interactions; Arreola had been Petitioner's boss for months and had also loaned Petitioner money.

20   (Reporter's Transcripts 459, 465 (Dkt. No. 12).) During the kidnapping itself, Arreola had several

21   minutes in which to observe his assailants from a close distance. (*Id.* at 607–09.) Petitioner points

22   to Arreola's apparent misidentification of another assailant as a factor in discrediting Arreola's

23   eyewitness testimony. (Pet. 8 (Dkt. No. 1 at 7).) However, Arreola made that identification—

1  which was later discredited—based only on his having heard the voice of that assailant. He never

2  had the opportunity to observe that assailant's face unobstructed and from close range, as he was

3  able to do with both Petitioner and Petitioner's brother. Accordingly, the trial court's decision to

4  exclude the proffered expert testimony was warranted by the facts, was within its broad discretion,

5  and does not reflect an unreasonable application of federal law. 28 U.S.C. § 2254(d).

6  **C.  Claim Three: Trial Court's Refusal to Strike the Bodily Harm Enhancement**

7  The California Penal Code provides that in kidnapping convictions, when the victim

8  "suffers death or bodily harm, or is intentionally confined in a manner which exposes that person

9  to a substantial likelihood of death," the defendant's punishment is enhanced from life *with* the

10  possibility of parole to life *without* possibility of parole. CAL. PENAL CODE § 209(a). In Petitioner's

11  case, the trial court found the facts to support such an enhancement, thereby resulting in a sentence

12  of life without possibility of parole. Petitioner claims that the trial court abused its discretion in

13  refusing to strike this bodily harm enhancement. (Pet. 9 (Dkt. No. 1 at 8).)

14  Respondent and Petitioner disagree about whether the habeas petition properly presents a

15  federal claim upon which relief can be granted. Respondent emphasizes that federal relief under 28

16  U.S.C. § 2254(a) is only available where clearly established federal law is at issue, and contends

17  that the decision to strike sentencing allegations or findings is strictly the province of state law.

18  (Answer 9 (Dkt. No. 11) (*citing Middletown v. Cupp*, 768 F.2d at 1085).) Petitioner argues that the

19  trial court's refusal to strike the enhancement constituted an arbitrary and capricious decision and

20  an abuse of discretion, thus violating the Due Process Clause of the Fourteenth Amendment.

21  (Traverse 18 (Dkt. No. 15) (*citing Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980)).) Even assuming,

22  arguendo, that Petitioner has properly stated a claim that entitles him to federal relief, he still has a

23  difficult burden—where the trial court has made a discretionary ruling, it will not be disturbed

ORDER - 13

1   unless it is found to be "objectively unreasonable." 28 U.S.C. § 2254(d), (e)(1); *Lockyer,* 538 U.S.

2   at 74. Similarly, the trial court's determination of the facts is presumed to be correct, and Petitioner

3   must rebut that presumption. 28 U.S.C. § 2254(d), (e)(1).

4          Section 1385 of the California Penal Code is the relevant provision that creates the option

5   for judges to strike or dismiss enhancements:

6          (a) The judge or magistrate *may*, either of his or her own motion or upon the application of
           the prosecuting attorney, and in furtherance of justice, *order an action to be dismissed*. The
7          reasons for the dismissal must be set forth in an order entered upon the minutes.
           . . .
8          (c)(1) If the court has the authority pursuant to subdivision (a) to strike or dismiss an
           enhancement, the court *may instead strike the additional punishment for that enhancement*
9          in the furtherance of justice in compliance with subdivision (a).

10   CAL. PENAL CODE § 1385 (emphasis added).

11         While this section provides judges with *discretion* to dismiss actions or enhancements, it

12   does not create any affirmative duty upon them to do so. And, while a judge who chooses to

13   dismiss an enhancement must set forth the reasons for doing so in the minutes, *id.*, a judge who

14   refrains from such a dismissal and chooses simply to leave a sentence undisturbed, faces no similar

15   requirement to record or justify the underlying reasoning. The trial judge in this case nevertheless

16   explicitly outlined five principal reasons for refusing to strike the enhancement, including: (1) that

17   the kidnapping involved planning and (2) lying in wait; (3) that Petitioner was involved in the

18   infliction of bodily harm on Arreola; (4) that Petitioner had a role in seeking ransom money; and

19   (5) that Petitioner was subsequently involved in unrelated altercations while at county jail. (Pet. 8

20   (Dkt. No. 1).) Petitioner disputes each of these findings and seeks to downplay his role in the entire

21   kidnapping. (*Id.*) However, any one of these reasons *alone* could be independently sufficient to

22   justify the trial court's refusal to strike as reasonable under 28 U.S.C. § 2254(d), particularly in

23   light of the broad discretion afforded to the trial court in its sentencing decisions.

ORDER - 14

One factor that the trial court should consider when exercising its discretion under Section 1385 of the California Penal Code is the circumstances of the defendant's current crimes. *See, e.g., People v. Williams*, 948 P.2d 429, 437–38 (1998) (factors to be considered in determining whether a trial court should strike a prior serious or violent felony for sentencing purposes). In this case, the trial court made numerous factual findings regarding Petitioner's conduct in the instant crime that support the decision not to strike as a reasonable one. While Petitioner disputes many of those findings, he has not shown any of them to be objectively unreasonable by clear and convincing evidence. Nor has he overcome the presumption of correctness that such factual determinations are afforded. 28 U.S.C. § 2254(e); *Lockyer*, 538 U.S. at 74.

For example, Petitioner asserts that both advanced planning and lying in wait are inherent components of kidnapping for ransom, and therefore should not have been relevant factors in the trial court's decision. (Pet. 9 (Dkt. No. 1 at 8).) However, the trial court's consideration of these factors was primarily intended to refute the defendants' claims of a lack of criminal sophistication. (Ct. App. Op. 24 (Dkt. No. 12).) Petitioner did not simply follow a spur-of-the-moment impulse—as is conceivable in some kidnappings—but took part in a scheme that was deliberate, motivated by vengeance, and involved planning and observing the victim for several days in advance. (*Id.* at 24–25.) The trial court properly considered these factors in refusing to strike the enhancement. Similarly, while Petitioner does not dispute that Arreola suffered bodily harm, he does argue that he was less culpable than his brother Enedino in this area, since he did not obtain the handgun or use it during the struggle. However, both the trial court and the California Court of Appeal found Petitioner's involvement to be substantial: Petitioner "was involved in the beating, was an equal participant, and did not simply drive the car. . . . [H]e was identified by Arreola as one of the men who attacked him in the parking lot, which means that he participated in the assault or, at a

ORDER - 15

1   minimum, he aided and abetted Enedino in brutally beating Arreola." (*Id.* at 23, 25.) The record

2   and these factual findings quite reasonably impacted the trial court's decision not to strike the

3   sentencing enhancement. Additionally, the California Court of Appeal noted the fact that Petitioner

4   and his brother had been neither particularly remorseful nor particularly well behaved during their

5   time in jail, (*Id.* at 26–27), both of which are additional factors that may influence the exercise of

6   discretion in sentencing decisions. Petitioner disputes these reasons, but has not shown the factual

7   findings to be objectively unreasonable, and thus, has not shown the trial court's decision to be an

8   abuse of discretion or an objectively unreasonable application of the Due Process Clause of the

9   Fourteenth Amendment. Accordingly, Petitioner's third claim for habeas relief is denied.

10          **D.  Claim Four: Sentence of Life Without Possibility of Parole was Cruel and Unusual**

11          Finally, Petitioner claims that his sentence of life without possibility of parole constitutes

12   cruel and unusual punishment in violation of the Eighth Amendment. In support of this claim,

13   Petitioner again seeks to distance himself from the ransom and the bodily harm elements of the

14   kidnapping, alleging in part that "[n]o evidence connects Petitioner to any offense beyond simple

15   kidnapping." (Pet. 11 (Dkt. No. 1 at 10).) Additionally, Petitioner contends that his sentence is

16   disproportionately severe, particularly in comparison with that of his codefendant, Zamora, who

17   despite having played a comparable role in the events, was only sentenced to time served[2] after he

18   entered a plea to robbery. (Reporters Transcripts 111–123 (Dkt. No. 12).)

19          This same claim was raised in state court, and the California Court of Appeal reasoned that

20   Petitioner's sentence was not cruel and unusual based upon consideration of the similar facts and

21   reasons that informed its decision on the third claim: the seriousness of the kidnapping,

22   Petitioner's lack of acceptable behavior while in jail, and the lack of remorse he expressed when

23   _____
[2] The trial court estimated that Zamora's time served up to that point was approximately 274 days. (Reporters Transcripts 115 (Dkt. No. 12).)

ORDER - 16

1   given the opportunity to do so. (Ct. App. Op. 26–27 (Dkt. No. 12).)

2          The selection of a proper penalty for a criminal offense is generally a matter of legislative

3   prerogative. *Rummel v. Estelle,* 445 U.S. 263, 274 (1980); *United States v. Brownlie,* 915 F.2d

4   527, 528 (9th Cir. 1990). The Supreme Court has read the Eighth Amendment's prohibition

5   against cruel and unusual punishment as containing a "narrow proportionality principle." *Ewing v.*

6   *California,* 538 U.S. 11, 20 (2003). In essence, the "Eighth Amendment does not require strict

7   proportionality between crime and sentence. Rather, it forbids only extreme sentences that are

8   'grossly disproportionate' to the crime." *Id.* at 23 (*quoting Harmelin v. Michigan,* 501 U.S. 957,

9   1001 (1991) (Kennedy, J., concurring)).

10          In support of Petitioner's claim that his sentence is disproportionately severe, he argues

11   that his sentence does not conform to the relative disparity of culpability, or reflect Petitioner's

12   comparably minor role in the kidnapping in relation to both his brother Enedino and to the third

13   defendant, Zamora. (Traverse 23–25 (Dkt. No. 15).) However, under the Eighth Amendment, the

14   reviewing court need not compare the sentence with that of other defendants in the case; instead,

15   the critical determination is whether a "'comparison of the crime committed and the sentence

16   imposed leads to an inference of gross disproportionality.'" *United States v. Bland,* 961 F.2d 123,

17   129 (9th Cir. 1992) (*quoting Harmelin,* 501 U.S. at 1004–05).

18          In Petitioner's case, no such gross disproportionality exists. A jury convicted Petitioner of

19   kidnapping for ransom, and the trial court found the crime to be aggravated by the fact that the

20   victim suffered bodily harm and was exposed to a substantial likelihood of death. (Answer 9 (Dkt.

21   No. 11)); CAL. PENAL CODE § 209(a). The California Court of Appeal has addressed this exact

22   issue in *People v. Castillo,* 284 Cal. Rptr. 382 (1991), a kidnapping case with similar

23   circumstances and the same sentence of life imprisonment without the possibility of parole. In

ORDER - 17

1  *Castillo,* the court deferred to the California Legislature's chosen sentence: "given the long-

2  standing, even ancient, horror of kidnapping and the substantial risk to human life that it presents,

3  we conclude[] that the punishment is not excessive." *Id.* at 399 (citations omitted). Similarly, the

4  Ninth Circuit has recognized the crime of kidnapping to be "a heinous offense." *Bates v. Johnson,*

5  111 F.2d 966, 967 (9th Cir. 1940). The sentence of life in prison without the possibility of parole is

6  a harsh one, but it is a legitimate acknowledgment by the California State Legislature of the

7  immense danger inherent in kidnappings. Petitioner created exactly that substantial risk to human

8  life when Petitioner helped the other kidnappers beat Arreola, tie him up, place him in the trunk of

9  a car, rob him, and leave him in an abandoned farmhouse. (Ct. App. Op. 3–4 (Dkt. No. 12).)

10  Petitioner's conduct placed Arreola's life in jeopardy, and undoubtedly contributed to or facilitated

11  the infliction of great bodily and emotional harm on the victim. (*Id.* at 26–27.) The state court did

12  not abuse its discretion by adhering to the full penalty set forth under the Penal Code, and

13  accordingly, did not act contrary to, or by unreasonably applying, clearly established federal law.

14  Petitioner's sentence is not excessive, nor does it constitute cruel and unusual punishment under

15  the Eighth Amendment.

16  **IV.    CONCLUSION**

17      For the foregoing reasons, the Court hereby DENIES Petitioner's petition for a writ of

18  habeas corpus (Dkt. No. 1), and the Clerk is instructed to close this case.

19      DATED this 18th day of June, 2009.

20

21

22

23

John C. Coughenour
UNITED STATES DISTRICT JUDGE

ORDER - 18