Hon. John C. Coughenour

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

JOSE GUADALUPE CALDERON,

        Petitioner,

   v.

LARRY SCRIBNER, *et al.*,

        Respondents.

C07-0716-JCC

**ORDER**

This matter comes before the Court on a petition for a certificate of appealability. (Dkt. No. 23). For the reasons explained below, the Court hereby DENIES the motion.

**I.    BACKGROUND**

Petitioner is a state prisoner at Calipatria State Prison in California, where he is serving a sentence of life without possibility of parole, plus one year. (Pet. for Writ (Dkt. No. 1)). He was convicted by a California jury of (1) kidnaping for ransom, (2) robbery, (3) false imprisonment, and (4) assault with a firearm. (*Id.*). The jury found that Petitioner was armed with a handgun during the commission of all four crimes, and that the victim suffered bodily harm and was "intentionally confined in a manner which expose[d] [him] to a substantial likelihood of death." (Answer 9 (Dkt. No. 11)).

The convictions stem from the January 2003 kidnaping of Humberto Arreola, the owner of a California landscaping company. Petitioner worked for Mr. Arreola's company until December 2002, when he was fired. On January 9, 2003, at 6 a.m., Mr. Arreola parked his truck outside his place of business and began walking into work. Three males, two of whom were masked and one of whom was unmasked and armed with a handgun, stopped him before he reached the door. As the men beat him about the face and neck, Mr. Arreola managed to unmask his two masked assailants, thereby revealing Petitioner and his brother, Enedino Calderon. At some point during the attack, a gun was fired, although Mr. Arreola was not shot. (Ct. App. Op. 2–3 (Dkt. No. 12)).[1]

The attackers subdued Mr. Arreola, and told him that nothing would happen if he were to cooperate. They tied his hands with red tape, and placed him in the trunk of a blue car. The attackers drove Mr. Arreola about twenty minutes from where the attack had taken place to an old farmhouse, where they told him they intended to ransom him for $500,000. Mr. Arreola objected that he could not access such a large quantity of money. The men took his wallet, which contained $700 in one-hundred-dollar and twenty-dollar bills, and left him alone in the farmhouse. After waiting approximately one hour for the men to return, Mr. Arreola began to work his way free. At approximately 7:40 a.m., he escaped the farmhouse and flagged down a passing automobile. The driver called 911 on his behalf, and he was taken to the hospital. (*Id.* 3–5). Mr. Arreola's injuries were significant: He suffered two lacerations to the back of his skull, which required a total of eight staples to close. He also suffered a broken nose, and a laceration above his right eyebrow which required eight stitches. The treating physician stated that the injuries were consistent with being pistol-whipped. (*Id.* 5).

The evidence against Petitioner was overwhelming. Jurors heard the testimony of Mr. Arreola himself, who testified that he was able to recognize Petitioner as one of his attackers. They also heard

---

[1] All facts are generally taken from the unpublished opinion of the California Court of Appeal. Neither party has objected to the facts contained therein.

from Jason Dill, who worked at the business next to Mr. Arreola's landscaping company, and observed the early-morning attack. He largely corroborated Mr. Arreola's account of what had happened in the parking lot. Deputy Kenny Lee also testified. He responded to Mr. Arreola's initial 911 call, and performed the first stages of the investigation. Deputy Lee discovered an abandoned farmhouse in the vicinity where Mr. Arreola had told police they would find it. Inside the farmhouse, the deputy discovered blood on walls and red packing tape in one room. Investigators also discovered blood inside the trunk and passenger compartment of a blue automobile that a witness tied to Petitioner. Jurors also learned that Petitioner was carrying $634 in cash when he was apprehended, including three one-hundred-dollar bills and ten twenty-dollar bills. Finally, Petitioner's girlfriend testified that he had left home at 5 a.m. with his brother Enedino Calderon on the morning of the kidnaping. This too was inculpatory evidence, as Enedino Calderon's fingerprints were discovered on the red tape found at the abandoned farmhouse. (*Id.* 5–7).

## II.    PROCEDURAL BACKGROUND

The jury convicted Petitioner on December 16, 2003. He timely appealed the convictions to the California Court of Appeal on January 20, 2004. The state appellate court reversed the third count of false imprisonment, but affirmed the convictions for the other three counts in an unpublished opinion issued on October 27, 2005. (Ct. App. Op. (Dkt. No. 12)). Petitioner then sought relief from the Supreme Court of California, which denied his petition for review on January 18, 2006.

Petitioner filed a petition for habeas corpus relief with the United States District Court for the Eastern District of California on April 16, 2007. (Pet. (Dkt. No. 1)). This Court denied his petition for relief in June 2009 (Order (Dkt. No. 19)), and Petitioner now seeks a certificate of appealability, which would allow him to argue his case before the United States Court of Appeals for the Ninth Circuit. (Mot. (Dkt. No. 23)).

//

## II. LEGAL STANDARD

Under 28 U.S.C. § 2253(c)(1)(A), a certificate of appealability is required to appeal "the final order in a habeas proceeding in which the detention complained of arises out of process issued by a state court." *See Wilson v. Belleque*, 554 F.3d 816, 824 (9th Cir. 2009). A certificate may issue in such circumstances "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). *See also Wilson*, 554 F.3d at 825–26. "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack*, 529 U.S. at 484). The certificate-of-appealability requirement "constitutes a gatekeeping mechanism that prevents [federal courts] from devoting judicial resources to frivolous issues while at the same time affording habeas petitioners an opportunity to persuade [courts] through briefing and argument of the potential merit of issues that may appear, at first glance, to lack merit." *Lambright v. Stewart*, 220 F.3d 1022, 1025 (9th Cir. 2000).

## III. DISCUSSION

Petitioner asks this Court to certify three issues for appeal. He argues that reasonable jurists could disagree with this Court's conclusion regarding whether the trial court violated his constitutional rights by (1) forcing him to share an interpreter with another defendant during certain stretches of the trial (Mot. 4–6 (Dkt. No. 23)); (2) excluding proffered expert testimony regarding the reliability of eyewitness identification (*Id.* 7–10); and (3) imposing a sentence of life without parole. (*Id.* 11–14).

//

**A.     Right to Counsel**

Petitioner and his brother Enedino Calderon stood trial as co-defendants. Both are native Spanish speakers, and neither speaks or understands English. The trial court generally adopted a team approach to translation, whereby one interpreter would translate the proceedings into Spanish at the defense table, while another was available to facilitate communication between co-defendants and attorneys. (Ct. App. Op. 11 (Dkt. No. 12)). The co-defendants could invoke their right to speak to their attorneys by raising their hands. The trial court would then pause the proceedings and allow for individual conferences. Each defendant availed himself of this option during trial. (*Id.*). On a few occasions, the co-defendants shared one interpreter. This occurred when the verdict was read, at sentencing, and during certain pretrial proceedings. (*Id.*).

During one hour of Enedino Calderon's testimony, there was only one interpreter because the other was delayed by a traffic accident. Defense counsel agreed to proceed with only one interpreter, who loudly translated the attorneys' questions of the witness into Spanish for both the witness and Petitioner, and then loudly translated the witness's answers into English for the court. The trial court ensured that the interpreter spoke loudly enough for Petitioner to hear what was being said. This procedure was used once more during a short period of Enedino Calderon's testimony, when the court's second interpreter was facilitating communication between an attorney and another Spanish-speaking witness, who was testifying under a grant of immunity. Throughout these brief periods, Petitioner could have raised his hand to request a conference with his attorney. (*Id.* 12).

Petitioner claims that the court's arrangement violated his constitutional right to counsel because "the only way Petitioner could have communicated with his attorney was to disrupt the entire proceedings and have [the second] interpreter translate for him." (Pet. Mot. 6 (Dkt. No. 23)). This Court rejected Petitioner's argument in its previous order, relying in part on the Seventh Circuit's reasoning in a case with similar facts, *United States v. Johnson*, 248 F.3d 655 (7th Cir. 2001). The Seventh Circuit

stated, "While we do read the Constitution as ensuring a defendant's right to communicate with his or her counsel, we do not read the Constitution as mandating the appointment of an additional interpreter to sit at the defense table." 248 F.3d at 664.

The Court refuses to certify Plaintiff's appeal on this issue. Petitioner fails to point to a single case holding that a court infringes a criminal defendant's constitutional right to counsel by depriving him of a court-appointed interpreter. (*See* Pet. (Dkt. No. 1); Pet. for Cert. 4–6 (Dkt. No. 23)). Assuming *arguendo* that such a right exists, the facts of this case would not rise to the level of a constitutional deprivation: Petitioner concedes that he used the individualized services of a court-appointed interpreter during the great majority of his trial, and points to only a few hours when he had to share an interpreter with another defendant. He fails to indicate any testimony offered during that time that hurt his cause. (*See* Pet. 4–6 (Dkt. No. 1)). Moreover, Petitioner was able to understand everything that was being said, and was informed that he could interrupt proceedings by raising his hand if he wished to speak with his attorney. (Ct. App. Op. 16 (Dkt. No. 12)). Because Plaintiff fails to cite law or fact supporting his motion, this Court concludes that no "reasonable jurist would find [its earlier] assessment of [Petitioner's] constitutional claims debatable or wrong." *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The Court therefore denies the petitioner for a certificate of appealability with respect to Petitioner's claim sounding in an infringement of his right to counsel.

**B.    Due-Process Right to Present Defense**

During the trial, Mr. Arreola identified Petitioner as one of his three assailants. Petitioner hoped to undermine Mr. Arreola's eyewitness identification by offering expert testimony regarding the reliability of eyewitness testimony. The trial court excluded such evidence as irrelevant, in part because Mr. Arreola had a long-standing familiarity with Petitioner from their pre-existing work relationship, and in part because additional evidence independently corroborated that Petitioner was one of Mr. Arreola's attackers. (*See* Pet. 8 (Dkt. No. 1)).

1  Petitioner concedes that the Supreme Court has never identified a right to offer expert testimony
2  regarding eyewitness identification. (*See* Pet. for Cert. App. 7 (Dkt. No. 23)). Petitioner therefore
3  grounds his argument directly in the Fourteenth Amendment's due-process guarantee that a state
4  criminal defendant shall have "the right to fair opportunity to defend against the state's accusations."
5  *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) ( also stating that "[t]he rights to confront and cross-
6  examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to
7  due process."). To prevail on such a claim, Petitioner bears the burden of demonstrating that the trial
8  court's decision to exclude the proffered evidence was "an unreasonable application" of his right to a
9  fair trial. *See* 28 U.S.C. § 2254(d). Petitioner's burden is a heavy one: Trial courts enjoy broad
10 discretion on all evidentiary matters, including those implicating constitutional rights. *See Jordan v.*
11 *Ducharme*, 983 F.2d 933, 938. This broad discretion extends to the testimony at issue in this case. *See*
12 *id.* at 938–39 ("The decision to admit [expert testimony about the reliability of eyewitness
13 identification] is left to the broad discretion of the trial judge.").

14 Petitioner grounds his argument chiefly in the fact that Mr. Arreola initially misidentified
15 another attacker whom subsequent evidence later exonerated. (*Id.*). Mr. Arreola's erroneous
16 identification was based on the other attacker's *voice*, however, not his appearance. Petitioner never
17 grapples with the factors that bore most heavily on the trial court's decision to exclude the proffered
18 expert testimony: Mr. Arreola had a long-standing relationship with Petitioner, and directly observed
19 Petitioner during several minutes of the kidnaping. (Reporter's Transcripts 459–465, 609 (Dkt. No. 12)).

20 This court denies the petition for a certificate of appealability with respect to Petitioner's claim
21 sounding in a due-process right to a fair trial. Most importantly, Plaintiff cannot point to a case
22 establishing a constitutional right to present expert evidence regarding the reliability of eyewitness
23 testimony. Assuming *arguendo* that such a right can be found in the due-process right to a fair trial,
24 Petitioner's case does not present facts that implicate it. This is not a case hinging on the testimony of a

single eyewitness, frightened in a dark alley by an unknown attacker who quickly flees the scene. If the prosecution were to present only the eyewitness's testimony in such a case, and nothing more, there might arise a constitutional right to offer expert testimony impeaching the reliability of the eyewitness identification. This Court is presented with decidedly different facts: Petitioner's long-time employer directly observed him for several minutes during the kidnaping. Independent corroborating evidence—like the denomination of the bills found in Petitioner's wallet and the fact that he left his home on the morning of the attack with his co-attacker—also pointed to guilt. Under these circumstances, the Court must deny the petition for a certificate of appealability.

**C.     Cruel and Unusual Punishment**

Petitioner argues that reasonable jurists could disagree with this Court's conclusion that his life-without-parole sentence constitutes cruel and unusual punishment. Petitioner offers two arguments: First, the punishment is unduly severe because he was nineteen years old when he committed the crime and had no criminal history. Second, the punishment is disproportionate because the third attacker, Jose Zamora, received a sentence of time served after pleading guilty to robbery.

The severity of the crime disposes of Petitioner's first argument. The Eighth Amendment allows state legislatures broad discretion to determine the proper penalty for violations of specific laws. As the Supreme Court has stated, the prohibition on cruel and unusual punishment contains only a "narrow proportionality principle[,]" *Ewing v. California*, 538 U.S. 11, 20 (2003), and "forbids only extreme sentences that are grossly disproportionate to the crime." *Id.* at 23. The California Court of Appeal affirmed the sentence with the following words:

> Jose's youth and lack of prior record pales in comparison to the seriousness of the crime he committed, his lack of acceptable behavior while in jail, and the lack of remorse he expressed when given an opportunity to do so. In fact, he indicated he would see the victim in hell. The sentence of life without the possibility of parole is not cruel and unusual as applied to him.

//

(Ct. App. Op. 27 (Dkt. No. 12)). Reasonable jurists might argue about what sentence is appropriate under such circumstances, but they cannot disagree with this Court's conclusion that the trial court's sentence was constitutionally valid.

Petitioner's second argument fares no better. Petitioner argues that the Eighth Amendment forbids a trial court from imposing disproportionate sentences on defendants charged with similar behavior in the same case. Petitioner grounds this argument in *Edmunds v. Florida*, 458 U.S. 782 (1982). *Edmunds*, however, stands for a relatively narrow proposition dealing with felony murder and the death penalty. *Id.* at 797 (holding that the Eighth Amendment forbids "imposition of the death penalty on one . . . who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed."). There was also a very good reason for Jose Zamora to receive a lighter sentence: Unlike Petitioner, he was not convicted of kidnaping for ransom and assault with a firearm. Having pled guilty only to second-degree robbery, he was ineligible for a life sentence. The prosecution also had good reason to accept a plea bargain: Mr. Arreola had not seen Zamora, and was only available to identify him by voice. There was also significantly less independent corroborating evidence pointing to Zamora's guilt. (Ct. App. Op. 26 (Dkt. No. 23)). Especially given Mr. Arreola's previous voice misidentification, the prosecution may have had legitimate concerns about securing a conviction on any charge at all.

**IV.   CONCLUSION**

For the aforementioned reasons, the Court DENIES the petition for a certificate of appealability. (Dkt. No. 23). The Clerk of the Court shall STRIKE Petitioner's motion to proceed *in forma pauperis* (Dkt. No. 22) as moot.

//

//

1        SO ORDERED this 2nd day of February, 2010.

2

3

4        _____
         JOHN C. COUGHENOUR
5        United States District Judge